**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: AHAZA SYSTEMS, INC.,
                                    *Debtor.*

EDMUND J. WOOD, in his capacity
as Chapter 7 Trustee,
                                    *Appellant,*

            v.

STRATOS PRODUCT DEVELOPMENT,
LLC,
                                    *Appellee.*

No. 05-35455

BAP No.
WW-04-01359-TPS

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Tighe,* Perris, and Smith, Bankruptcy Judges, Presiding

Argued and Submitted
November 14, 2006—Seattle, Washington

Filed April 3, 2007

Before: Pamela Ann Rymer, Marsha S. Berzon, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Rymer

*The Honorable Maureen A. Tighe, Bankruptcy Judge for the Central District of California, sitting by designation.

**COUNSEL**

Teresa H. Pearson, Seattle, Washington, for the appellant.

James R. Hermsen and Aaron D. Goldstein, Seattle, Washington, for the appellee.

**OPINION**

BERZON, Circuit Judge:

This case concerns whether payments for product design services made by Ahaza Systems, Inc. to Stratos Product Development LLC shortly before Ahaza filed for bankruptcy were preferential payments that must be returned to the bankruptcy estate. Plaintiff Edmund J. Wood, trustee of Ahaza's estate for the bankruptcy proceedings, seeks to recover two payments made to Stratos, maintaining that they were preferential and therefore voidable under the Bankruptcy Code. *See* 11 U.S.C. § 547(c)(2) (2000). The bankruptcy court granted summary judgment for defendant Stratos. Determining that the payments fell within the "ordinary course of business" exception to the prohibition on preferential transfers, *id.*, the Bankruptcy Appellate Panel of the Ninth Circuit (BAP) affirmed, holding that repayment of a debt can be within the "ordinary course of business" exception to the prohibition on preferential transfers even if both the underlying debt and any restructuring agreement are the first such transactions between the parties.

We agree with the BAP's basic holding. Although we normally decide whether a debt is "ordinary" by comparing it to

the parties' past practice with each other, we conclude that when the transaction at issue is the parties' first, "ordinary" can be determined in reference to the parties' practice with others. Because the standard we announce today was not available to the parties at the time of the bankruptcy court proceedings, and because summary judgment is not otherwise justified, we remand for further development of the summary judgment record, or, in the alternative, for trial.

## BACKGROUND

Stratos agreed to help develop products for Ahaza as part of a relationship that eventually soured. Alleging that Ahaza owed it money for work performed, Stratos threatened to sue Ahaza for breach of contract and other causes of action. Instead of heading to court, Stratos and Ahaza in 2001 entered into a Settlement Agreement and Release ("Agreement"). The Agreement provided that Ahaza would pay to Stratos $380,000 immediately, and $35,000 per month for the following year. Payments were due on the fifteenth day of each month. If Ahaza failed to pay within ten days of receiving notice of payment due, the entire remaining balance would immediately become due. The Agreement also provided that if Ahaza became subject to bankruptcy proceedings, the entire remaining balance would immediately become due, without notice or opportunity to cure.

Both any underlying contract for services and the 2001 Agreement were the first such transactions between Ahaza and Stratos, as far as the record shows. There is no evidence in the record of Ahaza's and Stratos's interactions prior to the Agreement.[1] It is undisputed, however, that pursuant to the

---

[1] Stratos's summary judgment motion states that the settlement agreement stems from a dispute over a $2.9 million product design and development contract entered into on November 8, 2000, under which Ahaza fell behind on its monthly payments. Stratos has not, however, presented evidence supporting this allegation, and Wood has not so admitted or

Agreement, Ahaza made the following payments by check to Stratos:

| Date due | Check written | Check cleared | Amount |
| --- | --- | --- | --- |
| 6/11/01 | 6/11/01 | 6/14/01 | $380,000 |
| 7/15/01 | 7/11/01 | 7/18/01 | $35,000 |
| 8/15/01 | 8/8/01 | 8/14/01 | $35,000 |
| 9/15/01 | 9/4/01 | 9/7/01 | $35,000 |
| 10/15/01 | 10/3/01 | 10/15/01 | $35,000 |
| 11/15/01 | 11/15/01 | 12/6/018 | $35,000 |
| 12/15/01 | 1/2/02 | 1/7/02 | $35,000 |
| 1/15/02 | 1/28/02 | 1/31/02 | $35,000 |
| 2/15/02 | 3/4/02 | 3/7/02 | $35,000 |

After Ahaza filed a voluntary Chapter 7 bankruptcy petition on April 24, 2002, Wood, the trustee of Ahaza's estate, filed a complaint on January 27, 2004, to recover under 11 U.S.C. § 547(b) (2000)[2] the last two payments that Ahaza had made

alleged. We therefore do not accept it as an undisputed fact on summary judgment. *See generally Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("[A]rguments and statements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment." (internal quotation omitted)).

[2]Unless otherwise specified, all references to 11 U.S.C. § 547 in this opinion are to the statute as it existed prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 ("2005 Act"), whose amendments do not apply to proceedings like this one, which commenced prior to the Act's enactment on April 20, 2005. Tit. XII, § 1213, 119 Stat. at 195.

to Stratos. Section 547(b) allows trustees of bankrupt estates to avoid certain transfers made to creditors within ninety days of the filing of a bankruptcy petition. Stratos filed for summary judgment on May 25, 2004, and Wood cross-filed for summary judgment shortly thereafter.

In support of its motion, Stratos submitted two declarations describing its business practices generally. One, from Michael Curneen, a principal owner and Chief Operating Officer of Stratos, states that a "large percentage" of the company's business is with "start-up companies whose cash positions are typically restricted," and that Stratos has often entered into agreements with start-ups that require payment on "predetermined calendar dates or at specific milestones." Curneen declared that such agreements often must be revised and that Stratos revised twenty-eight of the fifty-eight client agreements it entered into during 2001 and 2002 in various ways, including restructuring the debt, assuming an ownership interest in the client company, or instigating or threatening litigation.

Although the term "start-up" is not defined in Curneen's declaration, the other declaration filed by Stratos on summary judgment, from Myles Mutnick, an officer of a national trade association of high-tech companies, explains that "start-up companies" are "companies dependent on venture capital to sustain ongoing operations." He further reports that such companies "often face two uncertainties: the ability to raise venture capital and the time over which any such raised capital will be 'burned.'"

The Mutnick declaration goes on to state that because "[i]n the ordinary course of many of the vendor/start-up relationships, cash-flow of the start-up will be tight for a variety of well recognized reasons[,] . . . vendors typically resort to a variety of financial relationship strategies, including debt restructuring." The reason such debt restructuring or forgiveness "is . . . done in the ordinary course of vendor/start-up

relationships [is] in recognition that forceful collection action can jeopardize any potential for a future relationship and, depending on timing, sufficiently diminish cash reserves so as to imperil the viability of the start-up."

Based on these declarations and the evidence of Ahaza's payments under the Agreement, the bankruptcy court granted Stratos's motion for summary judgment and denied Wood's cross-motion. On appeal, the BAP affirmed the summary judgment. This timely appeal followed.

## STANDARD OF REVIEW

We review decisions of the BAP *de novo* and apply the same standard of review that the BAP applied to the bankruptcy court's ruling — here, *de novo* review of the summary judgment ruling. *Arrow Elecs., Inc. v. Justus* (*In re Kaypro*), 218 F.3d 1070, 1073 (9th Cir. 2000).

## DISCUSSION

Stratos, the creditor, does not dispute that the last two payments satisfied the definition of "preferential transfers" under § 547(b), as in effect at the time Stratos filed for bankruptcy.[3]

---

[3]Section 547(b) defines a preferential transfer as "any transfer of an interest of the debtor in property" that was:

  (1) to or for the benefit of a creditor;

  (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

  (3) made while the debtor was insolvent;

  (4) made —

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

It maintains however, that the transfers should not be voided because they fell under the "ordinary course of business" exception to the preferential transfers prohibition.

**[1]** At the time of the litigation in the bankruptcy court, the "ordinary course of business" exception, 11 U.S.C. § 547(c)(2), provided that the trustee may not avoid a transfer under § 547(b)

> to the extent that such transfer was —
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (C) made according to ordinary business terms.[4]

---

> (5) that enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 [of the Bankruptcy Code];
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

11 U.S.C. § 547(b) (2000).

[4]The 2005 Act maintained the basic requirements for the ordinary course of business exception but expanded the exception by making former § 547(c)(2)(B) (now codified as (A)), and § 547(c)(2)(C) (now codified as (B)) alternative, rather than cumulative, requirements. As amended, § 547(c)(2) now exempts transfers

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—

The parties agree that the challenged payments fulfill the third requirement, § 547(c)(2)(C), which requires that payments be "made according to ordinary business terms" to qualify for the exemption. *See generally In re Kaypro*, 218 F.3d at 1073-74 (concluding that payments made pursuant to a debt restructuring agreement are not *per se* outside the "ordinary business terms" of an industry). They dispute, however, whether the transfers were "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," 11 U.S.C. § 547(c)(2)(A), or "made in the ordinary course of business or financial affairs of the debtor and the transferee," *id.* at § 547(c)(2)(B).

**[2]** Although the statutory language does not specifically so provide, we have held previously in cases in which parties have an established course of dealing that § 547(c)(2)(A) and § 547(c)(2)(B) require that "the debt and its payment are ordinary in relation to past practices between the debtor and this particular creditor." *Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.)*, 971 F.2d 396, 398 (9th Cir. 1992); *see also Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 732 (9th Cir. 1994) (quoting *In re Food Catering*

---

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms.

Because of this change, first-time transfers can come within the exception if they meet the "ordinary business terms" requirement, measured by industry practice, even if there is no course of business between the parties. To that degree, the problem we discuss today does not arise under the new amendments. The amendments still require, however, that the "debt" have been incurred "in the ordinary course of business or financial affairs of the debtor and the transferee," so the first-time transaction issue remains pertinent with regard to the origin of the debt. *See generally* Charles J. Tabb, *The Brave New World of Bankruptcy Preferences*, 13 Am. Bankr. Inst. L. Rev. 425 (2005) (discussing the 2005 revisions to the ordinary course of business exception).

*& Hous., Inc*).[5] In other words, to determine what is "ordinary" among parties who have interacted repeatedly, we inquire into the pattern of interactions between the *actual* creditor and the *actual* debtor in question, not about what transactions would have been "ordinary" for either party with *other* debtors or creditors.[6]

As a consequence, with regard to § 547(c)(2)(B), we evaluate the challenged transfers in light of Ahaza's prior transfers to Stratos. Our task is more difficult with regard to § 547(c)(2)(A), however, for two reasons: (1) as far as appears in the present record, the debt for services in question is the result of the first transaction between Stratos and Ahaza, and (2) the Agreement between Stratos and Ahaza revised the terms of repayment of the debt. We address today, as a matter of first impression in this circuit, what "ordinary" in § 547(c)(2)(A) means if the debt in question is a first-time transaction between the parties, and what "debt" means when the original agreement between two parties is revised.

## I. Section 547(c)(2)(A): Ordinary course of business for a first-time debt

[3] Although we have never addressed how § 547(c)(2)(A) applies when the debt in question is a first-time transaction between the parties,[7] the two circuits that have considered the

---

[5] *Grand Chevrolet* and *Food Catering* did not have occasion to apply § 547(c)(2)(A), but both link the § 547(c)(2)(A) inquiry, as well as the § 547(c)(2)(B) inquiry, to "past practices."

[6] This inquiry has been dubbed the "subjective" inquiry in the case law for reasons that are not clear, as no inquiry into the parties' state of mind is involved. *See, e.g., Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 43 (2d Cir. 1996); *In re Midway Airlines, Inc.*, 69 F.3d 792, 797-98 (7th Cir. 1995).

[7] We have discussed the "past practices" test in two cases: *Grand Chevrolet* and *Food Catering*. Both cases involved situations in which there was a history of transactions between the parties, and neither case consid-

issue, the Sixth and Seventh Circuits, have held that issuance of debt "can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the [parties]." *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 908 (6th Cir. 1990); *see also Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003) ("[O]ther courts have [addressed the 'first-time' issue] with mixed results, although most side with the view that a first-time transaction is not per se ineligible for protection from avoidance under § 547(c)(2).") (citing *In re Finn* and several bankruptcy and district courts).

**[4]** We agree that first-time transactions may satisfy the requirements of § 547(c)(2)(A). "Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time." *In re Finn*, 909 F.2d at 908. With the "ordinary course of business" exception, Congress aimed not to protect well-established financial relations, but rather to "leave undisturbed *normal* financial relations, because [the exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991) (quoting H.R. REP. NO. 95-595, at 373 (1977)) (emphasis added). Together with the rule against preferential transfers, the ordinary course of business exception "deter[s] the 'race to the courthouse' and enabl[es] the struggling debtor to continue operating its business." *Id.* at 161. This animating policy concern is not erased simply because a

---

ered what is "ordinary" when there was no history of "past practices" — or, for that matter, explained why "past practices" are generally a useful reference. We are therefore free to consider now what test is appropriate when no past practices exist. *See In re Grand Chevrolet*, 25 F.3d at 732; *In re Food Catering & Hous., Inc.,* 971 F. 2d at 398; *see generally Hart v. Massanari,* 266 F.3d 1155, 1170 (9th Cir. 2001) ("In determining whether it is bound by an earlier decision, a court considers not merely the reason and spirit of cases but also . . . the facts giving rise to the dispute. . . ." (citations omitted)).

debt is the parties' first transaction. Thus, as the BAP observed, "[i]t would be inconsistent with the purpose of the section for Stratos to be prevented from receiving the benefit of the ordinary course of business exception" for otherwise routine transactions simply because Stratos never previously entered into a transaction with Ahaza.

Having held first-time debts eligible for the exception, we now must determine the criteria for deciding when a debt is incurred "in the ordinary course of business," albeit for the first time between the parties. Other courts' decisions point to several options. Through citation to *Huffman v. New Jersey Steel Corp.* (*In re Valley Steel Corp.*), 182 B.R. 728, 735 (Bank.W.D. Va. 1995), which relied upon *Finn*, the BAP in this case adopted the Sixth Circuit's position: When applied to new transactions, § 547(c)(2)(A) requires an inquiry into whether "the transaction would . . . be out of the ordinary for a person in the borrower's position." *In re Finn*, 909 F.2d at 908. Discussing a debt and its related transfers, the Seventh Circuit concluded that "[i]n some instances . . . the ordinary course of business may be established by the terms of the parties' agreement [regarding issuance of debt], until that agreement is somehow or other modified by actual performance." *Kleven*, 334 F.3d at 643 (regarding tax refund anticipation loans). Regarding first-time transfers under § 547(c)(2)(B), one bankruptcy court listed several additional relevant factors. The court concluded,

> When there are no prior transactions with which to compare, the court may analyze other indicia, including whether the transaction is out of the ordinary for a person in the debtor's position, or whether the debtor complied with the terms of the contractual arrangement, generally looking to the conduct of the parties, or to the parties' ordinary course of dealing in other business transactions.

*Meeks v. Harrah's Tunica Corp.* (*In re Armstrong*), 231 B.R. 723, 731 (Bankr. E. D. Ark. 1999) (citations omitted). The

factors listed by the Arkansas bankruptcy court are similar to those we have used to evaluate non-first-time transfers under § 547(c)(2)(B). *See In re Grand Chevrolet*, 25 F.3d at 732.

**[5]** We agree with the thrust of all three analyses that, when we have no past debt between the parties with which to compare the challenged one, the instant debt should be compared to the debt agreements into which we would expect the debtor and creditor to enter as part of their ordinary business operations. Consistent with *Food Catering*, however, this analysis should be as specific to the actual parties as possible. Thus, we hold that to fulfill § 547(c)(2)(A), a first-time debt must be ordinary in relation to this debtor's and this creditor's past practices when dealing with other, similarly situated parties. Only if a party has never engaged in similar transactions would we consider more generally whether the debt is similar to what we would expect of similarly situated parties, where the debtor is not sliding into bankruptcy. *See Union Bank*, 502 U.S. at 160 (distinguishing the "normal financial relations" protected by § 547(c)(2) from "unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy"). In this latter instance, the fact that a debt is the first of its kind for a party will be relevant but not dispositive.

Wood maintains that referencing similar third-party transactions — or, in their absence, expected practice of similarly situated parties — collapses § 547(c)(2)(A) into § 547(c)(2)(C), under which we always assess "ordinary" by reference to "prevailing business standards," *In re Food Catering & Hous., Inc.*, 971 F.2d at 398, in the relevant industry, *see In re Kaypro*, 218 F.3d at 1074. We disagree. Although the inquiries may overlap in the case of first-time transactions, they remain distinct. As we apply it today, § 547(c)(2)(A) still reflects the actual parties' practices insofar as that is possible and focuses on the issuance of debt itself, while § 547(c)(2)(C) focuses on the terms of the challenged transfers and reflects "the *broad range* of terms that encompasses the practices employed by [similarly situated]

debtors and creditors, including terms that are ordinary for those under financial distress." *Ganis Credit Corp. v. Anderson* (*In re Jan Weilert RV, Inc.*), 315 F.3d 1192, 1198 (9th Cir.), *amended by* 326 F.3d 1028 (9th Cir. 2003) (citing *In re Kaypro*, 218 F.3d at 1074).

## II. Section 547(c)(2)(A): Relevant debt when a revision of an original agreement is involved

[6] Underlying the parties' dispute in this case is a second legal question: When the payment agreement between two parties has been revised or restructured, what is the "debt" to be considered under § 547(c)(2)(A)? In awarding summary judgment to Stratos, the BAP addressed both the Agreement and the original transaction between Stratos and Ahaza. Wood represented at oral argument on appeal, however, that the only relevant debt was the Agreement. We believe the BAP's approach makes more sense, insofar as the original transaction that gave rise to the Agreement would otherwise be defined as "debt."**[8]**

In two separate contexts, we have found that both restructuring agreements and pre-restructuring debts are relevant to the prohibition on preferential transfers. On the one hand, in considering whether a challenged transfer satisfied § 547(c)(2)(C), we have treated a restructuring agreement as relevant to the "ordinariness" of the terms of the disputed transfers. *In re Kaypro*, 218 F.3d at 1074. On the other hand, when we have considered whether a debt is "antecedent" to challenged transfers — thereby contributing to the prima facie case for a preferential transfer — we have linked transfers to the original agreement between the parties, rather than to any later transaction that changes or nullifies that agreement. *Futoran v. Rush* (*In re Futoran*), 76 F.3d 265 (9th Cir. 1996), considered a husband's transfer in exchange for cancellation of a

---

**[8]**As we discuss later, there are no facts in the record about the pre-Agreement relationship between Stratos and Ahaza.

marital support agreement. We concluded that the transfer was made pursuant to the original marital support agreement by analogizing to the installment loan context, in which "debt is incurred when the loan is made and not when the payments become due." *Id.* at 267. In discussing whether a debt is antecedent to challenged payments, the Fifth Circuit has concluded even more explicitly that payments made as part of a settlement agreement were made pursuant to the pre-agreement arrangement, rather than pursuant to the settlement agreement itself. *See Baker Hughes Oilfield Operations, Inc. v. Cage* (*In re Ramba, Inc.*), 416 F.3d 394, 398-99 (5th Cir. 2005) (concluding that the relevant debt for a payment made to stave off an involuntary bankruptcy petition was created by the receipt of goods, not the later settlement agreement); *Southmark Corp. v. Schulte Roth & Zabel* (*In re Southmark Corp.*), 88 F.3d. 311, 318 (5th Cir. 1996) (concluding that a debt for costs and attorneys' fees associated with a legal dispute arose when demand was made, not when a settlement agreement was reached).

**[7]** A broad understanding of "debt," encompassing both the original and the revised agreement, is consistent with the Bankruptcy Code, which defines debt as a "liability on a claim," 11 U.S.C. § 101(12), and defines claim broadly to include "right[s] to payment, whether or not . . . reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,[or] undisputed," *id.* § 101(5)(A). Moreover, it would be inconsistent with the purpose of the ordinary course of business exception to exclude either the Agreement or the underlying transaction from our consideration. Our goal is to determine whether the payments made by Ahaza to Stratos were routine. We cannot make this determination by evaluating only a portion of the relationship that resulted in the challenged transfers.[9]

---

[9]We do not suggest today any change or clarification of our law regarding whether a debt is antecedent to challenged transactions.

**[8]** Thus, we hold that both the pre-Agreement arrangement between Ahaza and Stratos and the Agreement itself are relevant to § 547(a)(2)(A). To the extent that it would otherwise be considered a debt antecedent to the challenged payments, the pre-Agreement arrangement must be considered under this provision. The Agreement is relevant to the extent that it further elucidated or changed Ahaza's liability to Stratos.[10]

### III. Summary judgment

**[9]** With these clarifications of the law, we turn to the facts. We previously have determined that whether a transfer was "made according to ordinary business terms," § 547(c)(2)(C), "is a question of fact that depends on the nature of industry practice. . . . [and] is appropriately left to the bankruptcy court," *In re Kaypro*, 218 F.3d at 1073-74 (citations omitted). Because § 547(c)(2)(A) and § 547(c)(2)(B), in the context of first-time transactions, involve considerations similar to those under § 547(c)(2)(C), we hold that whether a debt or transfer was made "in the ordinary course of business or financial affairs of the debtor and the transferee," §§ 547(c)(2)(A), (B), is also a question of fact.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "A factual dispute is genuine only if a reasonable trier of fact could find in favor of the nonmoving party. A mere scintilla of evidence supporting [a nonmovant's] position is insufficient to withstand summary judgment." *Galen v. County of L.A.*, 468 F.3d 563, 568 (9th Cir. 2006) (citations and quotation omitted). Where evidence "is so one-sided that one party must prevail as a matter of law, a trial is unneces-

---

[10]The Agreement — and the threat of litigation of litigation that preceded it — may also be relevant to § 547(c)(2)(B) as evidence of whether Stratos's efforts to collect the challenged payments support the conclusion that the particular transfers were made in the ordinary course of business.

sary." *State Farm Fire & Cas. Co. v. Otto*, 106 F.3d 279, 283 (9th Cir. 1997) (quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). We conclude that summary judgment was not appropriate for either party with regard to § 547(c)(2)(A) or § 547(c)(2)(B).

**[10]** With regard to § 547(c)(2)(A), the BAP concluded that "the underlying debt was incurred under normal circumstances, as debtor originally owed Stratos money under a product design and development agreement." To the contrary, we find no facts in this record about the nature of the original agreement between Ahaza and Stratos, and nothing that would signal whether the debt was arms-length, routine, and ordinary, or otherwise. Although Stratos's two declarations discuss the company's and industry's practice with "start-ups," nothing in the record shows whether or not Ahaza resembled the start-ups discussed in the declarations. Similarly, although the Curneen declaration lists litigation as one means of revising its payment agreements, the declaration does not establish that the Agreement, entered into under threat of litigation, was in that respect entered into in the ordinary course of business. *Cf. Energy Coop., Inc. v. Socap Int'l, Ltd. (In re Energy Cooperative)*, 832 F.2d 997, 1004-05 (7th Cir. 1987) (holding that "a one-time payment to settle a breach of contract claim" was "not part of any recurring, customary trade transactions"); *Richardson v. Phila. Hous. Auth. (In re Richardson)*, 94 B.R. 56, 60-61 (Bankr. E.D. Pa. 1988). Stratos, which bears the burden of proof to establish qualification for the ordinary course exception, *In re Grand Chevrolet, Inc.*, 25 F.3d at 732, thus did not meet its burden on the present summary judgment record.

**[11]** We will not decide at this juncture, however, whether or not the evidence is so "one-sided" as to warrant summary judgment on the § 547(c)(2)(A) issue in favor of Wood. *See State Farm Fire and Cas. Co.*, 106 F.3d at 283. We articulate today a new legal standard for evaluating first-time debts under § 547(a)(2)(A), and clarify what qualifies as "debt"

under the provision. We therefore remand for further proceedings to ensure that both parties have adequate opportunity to develop the appropriate record evidence. *See generally Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1033 (9th Cir. 2004) (remanding case arising on summary judgment after the Supreme Court clarified the relevant standard); *Erickson v. United States*, 976 F.2d 1299, 1302 (9th Cir. 1992) (remanding a summary judgment appeal after we clarified the burden of proof on the relevant standard).

**[12]** Summary judgment is equally inappropriate with regard to § 547(c)(2)(B), which requires a determination of whether the challenged payments themselves were ordinary. Although more informative than the record regarding the underlying debt, the evidence regarding Ahaza's payments to Stratos is insufficient to support summary judgment for either party.

When, as here, there is a history of payments among the parties,

> [a]mong the factors courts consider in determining whether transfers are ordinary in relation to past practices are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and, 4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*In re Grand Chevrolet, Inc.*, 25 F.3d at 732.

The BAP evaluated the available evidence in light of the *Grand Chevrolet* factors and noted that "it is difficult to determine whether the challenged payments were within the ordinary course of business between Ahaza and Stratos." It nonetheless affirmed summary judgment to Stratos on this

issue, holding that although the challenged payments were unusual because they were made a bit later than most of the previous ones, the payments were ordinary because (1) the amount and form of tender stayed constant over the course of payments under the Agreement; and (2) there is no evidence of unusual collection activity or other circumstances indicating that Stratos was taking advantage of Ahaza's deteriorating condition. In so finding, the BAP necessarily held that Stratos met its burden of proving the exception by a preponderance of the evidence, *see In re Grand Chevrolet, Inc.*, 25 F.3d at 732, and that evidence of the payments' lateness was not sufficient — as a matter of law — to defeat invocation of the "ordinary course of business exception."

We agree with the BAP that a reasonable trier of fact could find in favor of Stratos and that summary judgment for Wood on this point is therefore inappropriate. But given the fact-specific nature of the inquiry and the lack of a precise formula concerning how the four *Grand Chevrolet* factors — or other factors — should be combined, we cannot agree that summary judgment for Stratos was appropriate. We conclude instead that a reasonable trier of fact could, on the present record, find in favor of Wood on the § 547(c)(2)(B) issue for two reasons.

First, "[d]elay is particularly relevant in taking a payment outside the ordinary course of business exception." *In re Food Catering & Hous., Inc.*, 971 F.3d at 398. The challenged payments cleared sixteen and twenty days after the payments were due, less time after their respective due dates than two prior payments under the Agreement. Still, the two challenged checks were *written* thirteen and seventeen days after the due dates, later than all seven other post-Agreement checks, except for the immediately prior one. *See generally Matter of Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1032 (7th Cir. 1993) (stating that a creditor seeking an ordinary course of business exception must show that payments "conform to the norm established by the debtor and the creditor in the period before, *preferably well before*, the preference period" (emphasis

added)). Nothing in the record explains why some checks cleared later than others, or whether the clearance delay was the fault of Ahaza or its bank. The present record thus does not sufficiently flesh out the significance or intricacies of the delay to permit a determination of the impact of this factor.

The record also does not establish other indicators of the prior course of business between Stratos and Ahaza adequately enough to permit summary judgment in Stratos's favor. There is no evidence in the record of the timeliness of Ahaza's pre-Agreement payments, or of Stratos's pre- or post-Agreement payment demands. *Cf. Bell Flavors & Fragrances, Inc. v. Andrew* (*In re Loretto Winery, Ltd.*), 107 B.R. 707, 710 (B.A.P. 9th Cir. 1989) (concluding that § 547(a)(2)(C) was not satisfied when "[t]he record of prior conduct of the debtor and transferee is so random and haphazard that it yields no reasonable, ascertainable boundaries"). Furthermore, the record does not establish whether the threat of litigation overshadowing the Agreement payments was routine for Stratos.

**[13]** Consequently, on this point, we affirm the BAP's ruling on Wood's motion, reverse its ruling on Stratos's motion, and remand for further proceedings. *See generally In re Kaypro*, 218 F.3d at 1074-76 (remanding case for trial on "ordinary course of business" exception, when the relevant evidence included only the creditor's declaration and the debtor's deposition regarding their usual business practices, and the trustee's allegations of "unusual collection efforts . . . , lateness of payments under the notes, and an inadequate showing of a continuing business relationship with the debtor").

## CONCLUSION

For the foregoing reasons, summary judgment is inappropriate for either party in this case. **AFFIRMED in part, REVERSED and REMANDED in part.**

RYMER, Circuit Judge, dissenting:

I reluctantly part company because the majority adopts an apparently sensible solution to the "always-a-first-time" conundrum. My difficulty is that the solution — applying a three step analysis triggered only when the debt in question was the first transaction between the particular debtor and the particular creditor — doesn't obviously square with either the statutory construct or what we said in *In re Food Catering & Housing, Inc.*, 971 F.2d 396 (9th Cir. 1992). The former Section 547(c)(2)(A), applicable to this case, stated that a transfer fell under the ordinary course exception only if it was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee"; the present Section 547(c)(2) preserves this requirement. Interpreting this statutory language, *Food Catering* held that "[t]o qualify for the 'ordinary course' exception, a creditor must prove that: 1) the debt and its payment are ordinary in relation to past practices between the debtor and this particular creditor; *and* 2) the payment was ordinary in relation to prevailing business standards." *Id.* at 398. Thus, while neither § 547(c)(2)(A) nor *Food Catering* in so many words *precludes* treating a first transaction differently, neither *permits* it, either. And doing so here means that evidence of the parties' other transactions and common practices in the industry may be considered in *some* cases where it arguably makes sense to do so, namely, when the transaction is the first one, but not in all cases in which it also arguably makes sense to do so, because *Food Catering* stands in the way whenever the debtor and transferee have a history of past transactions — even if these past transactions were simply business dealings of a different kind that in no way suggest that the debt transaction in question was out of the ordinary for either party's business or in the industry.