**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

In re:  C.W. MINING COMPANY,

Debtor.

-------------------------------

GARY E. JUBBER, Trustee,

Appellant,

v.

SMC ELECTRICAL PRODUCTS, INC.;
BECKER MINING AMERICA, INC.,

Appellees.

No. 13-4175

---

**APPEAL FROM THE UNITED STATES**
**BANKRUPTCY APPELLATE PANEL**
**(BAP No. 13-026-UT)**

---

Peter W. Billings, Fabian & Clendenin, Salt Lake City, Utah, (Gary E. Jubber and
Douglas J. Payne, Fabian & Clendenin; and Michael N. Zundel and Callie Buys Rogers,
Prince, Yeates & Geldzahler, Salt Lake City, Utah, with him on the briefs), for Appellant.

Jeffrey L. Shields (Jacob D. Lyons, with him on the brief), Callister Nebeker &
McCullough, Salt Lake City, Utah, for Appellees.

---

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

_____

C.W. Mining Company, a coal-mining company, was forced into bankruptcy after creditors filed a petition for involuntary bankruptcy on January 8, 2008. Several months before the petition was filed, C.W. Mining had entered into its first contract with SMC Electrical Products, Inc.—an agreement to purchase equipment with a view toward greatly increasing coal production by converting its mining method from continuous mining to a longwall system. One payment for the equipment was a $200,000 wire transfer from C.W. Mining on October 16, 2007. Because this transfer was less than 90 days before the petition was filed, the bankruptcy trustee (the Trustee) sought to recoup the $200,000 for the bankruptcy estate by initiating an adversary proceeding to avoid the transfer under 11 U.S.C. § 547(b). Granting SMC summary judgment, the bankruptcy court rejected the Trustee's claim on the ground that the debt was incurred and the payment made in the ordinary course of business. This circuit's bankruptcy appellate panel (BAP) affirmed. We do the same.[1]

## I.    DISCUSSION

_____

[1] The Trustee filed a motion for leave under Fed. R. Civ. P. 60(a) to request the bankruptcy court to correct its order, arguing that the "order being reviewed is, due to an error, not a final order because it did not resolve all of the claims in the adversary proceeding." Aplt. Mot. for Leave to Req. Bankr. Ct. Correct Order under Fed. R. Civ. P. 60(a), at 2, _Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)_, No. 13-4175 (10th Cir. June 30, 2014). We deny the motion because the final order from the bankruptcy court dismissed the adversary proceeding, thereby disposing of all claims even though the court did not address them all.

2

## A. Standard of Review

"In an appeal from a final decision of a bankruptcy court, we independently review the bankruptcy court's decision, applying the same standard as the bankruptcy appellate panel or district court." *Aviva Life & Annuity Co. v. White (In re Millennium Multiple Emp'r Welfare Benefit Plan)*, 772 F.3d 634, 638 (10th Cir. 2014) (brackets and internal quotation marks omitted). We review a bankruptcy court's construction of the Bankruptcy Code de novo. *See Fid. Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1174 (10th Cir. 1989) (per curiam). Because the bankruptcy court granted summary judgment to SMC, we also review the record de novo, examining the evidence in the light most favorable to the Trustee to determine whether SMC established that there was "no genuine dispute as to any material fact" and it was "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Jubber v. Bank of Utah (In re C.W. Mining Co.)*, 749 F.3d 895, 898 (10th Cir. 2014) ("this court reviews the bankruptcy court's grant of summary judgment de novo"); *cf. Mallo v. IRS (In re Mallo)*, 774 F.3d 1313, 1317 (10th Cir. 2014) ("In reviewing a bankruptcy court decision under 28 U.S.C. § 158(a) and (d), the district court and the court of appeals apply the same standards of review that govern appellate review in other cases." (internal quotation marks omitted)).[2]

_____

[2] It has come to our attention that on two occasions this court apparently reviewed a bankruptcy-court ruling on summary judgment for clear error rather than de novo. *See Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1333, 1339 (10th Cir. 1996); *Fid. Sav. & Inv. Co.*, 880 F.2d at 1174. Neither opinion cited a summary-judgment precedent. Those two precedents should not be followed. As the Third Circuit

Continued . . .

But we limit our review to the arguments that have been properly preserved. In particular, we do not consider matters in the record that were not presented to the bankruptcy court in the Trustee's summary-judgment pleadings. *See Mitchell v. City of Moore*, 218 F.3d 1190, 1199 ("The district court was not obligated to comb the record in order to make [appellant's] arguments for him.").

## B.      Avoidance and the Ordinary-Course-Of-Business Exception

In general, a payment made by an insolvent debtor to a creditor on an antecedent debt made within 90 days before the filing of a bankruptcy petition is a preferential transfer, which the trustee may avoid so that it can include the value in the bankruptcy estate. *See* 11 U.S.C. § 547(b). As the Supreme Court has noted, "A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim

---

explained in rejecting a district court's application of the clearly-erroneous standard when reviewing a bankruptcy court's summary judgment:

> [B]ecause summary judgment may only be granted where there is no genuine issue of material fact, any purported "factual findings" of the bankruptcy court cannot be "factual findings" as to disputed issues of fact, but rather are conclusions as a matter of law that no genuine issue of material fact exists; such conclusions of law are, of course, subject to plenary review. Thus, when either a district court or an appellate court reviews a grant of summary judgment, the standard of review is plenary; any application of the "clearly erroneous" standard is, in itself, clearly erroneous.

*Rosen v. Bezner*, 996 F.2d 1527, 1530 n.2 (3rd Cir. 1993); *accord Gray v. Manklow* (*In re: Optical Techs, Inc.*), 246 F.3d 1332, 1335 (11th Cir. 2001). To avoid any future uncertainty, this opinion has been circulated to all unrecused active members of this court and all agree that bankruptcy-court summary judgments are subject to de novo review on appeal. Insofar as *Jobin* and *Fidelity Savings* hold otherwise, they are hereby overruled.

4

against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate." *Union Bank v. Wolas*, 502 U.S. 151, 160–61 (1991) (internal quotation marks omitted). The preference section serves two purposes. The more important one is to "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally." *Id.* at 161 (internal quotation marks omitted). The other purpose is to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy," thereby giving the debtor an opportunity "to work his way out of a difficult financial situation through cooperation with all of his creditors." *Id.* (internal quotation marks omitted).

But there are some exceptions to this avoidance power, one of which is the subject of this appeal. Under § 547(c)(2), a trustee may not avoid a transfer "to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee" when "such transfer was . . . (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms." At one time the Bankruptcy Code was often read to require the transferee to prove both (A) and (B)—that is, that the payment was made in the ordinary course *and* that it was made according to ordinary business terms. *See* 5 Collier on Bankruptcy § 547.04[2] (Alan N. Resnick & Henry J. Sommers eds., 16th ed. 2014). But Congress amended the statute in 2005 to

make clear that subparagraphs (A) and (B) are alternatives. *See id.* The language of each alternative, however, remains the same, so case law interpreting each survives. *See id.* SMC relies only on subparagraph (A).

This circuit construes the exception narrowly. *See Jobin*, 84 F.3d at 1339. And the transferee bears the burden of establishing the exception by a preponderance of the evidence. *See* 11 U.S.C. § 547(g).

"[The ordinary-course-of-business] exception was intended to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Union Bank*, 502 U.S. at 160 (internal quotation marks omitted). Although "[o]n the one hand, any exception for a payment on account of an antecedent debt tends to favor the payee over other creditors and therefore may conflict with the policy of equal treatment," *id.* at 161, "[o]n the other hand, the ordinary course of business exception may benefit all creditors by deterring the 'race to the courthouse' and enabling the struggling debtor to continue operating its business," *id*; *see Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir. 1993) (The preference section "discourages 'unusual action' that may favor certain creditors or hasten bankruptcy by alarming other creditors and motivating them to force the debtor into bankruptcy to avoid being left out." But even if

6

payments were "not common," they may be in the ordinary course if "they did not favor certain creditors or encourage a race to dismember the [debtor].").[3]

The incurrence of the debt and the payment must be in the ordinary course of business for both the debtor *and* the transferee. *See* 11 U.S.C. § 547(c)(2) ("debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee"); *id.* § 547(c)(2)(A) ("made in the ordinary course of business or financial affairs of the debtor and the transferee"); *Union Bank*, 502 U.S. at 162 (remanding to court of appeals to decide "whether the loan involved in this case was incurred in the ordinary course of the Debtor's business and of the Bank's business"); *Fid. Sav. & Inv. Co.*, 880 F.2d at 1177–78 (examining the ordinary course of business for each party);

---

[3] On appeal the Trustee asks us to adopt the meaning of the term *ordinary course of business* in Section 364(a) of the Bankruptcy Code. But because the Trustee did not make this argument before the bankruptcy court, we need not consider it. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). And even if we were to consider the argument, we would likely reject it. The Trustee is correct that we generally assume that a term carries the same meaning throughout a statute. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 460 (1993). But because the purposes of sections 547(c) and 364(a) differ, we should be cautious about applying the same definition to both. *See Johnson v. Barnhill (In re Antweil)*, 931 F.2d 689, 692 (10th Cir. 1991) ("because [the] purposes of sections 547(b) and 547(c) are completely different, [the] definition of 'transfer' need not be [the] same for both sections"). The aim of the ordinary-course standard under § 364(a) is to determine whether a postpetition transaction is so "ordinary" that creditors, to whom the debtor owes fiduciary duties, *see Wolf v. Weinstein*, 371 U.S. 633, 649 (1963), need not receive notice of its existence. *See In re Husting Land & Dev., Inc.*, 255 B.R. 772, 777 (Bankr. D. Utah 2000). This is quite a different inquiry from the § 547(c)(2) inquiry into whether the transaction would have been entered into absent the debtor's slide into bankruptcy. The § 364(a) notion of *ordinary* should be, and is, more restrictive than the notion of the same term under § 547(c)(2), which undoubtedly accounts for the Trustee's desire to apply it.

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874 (the debt must be incurred and the transfer made "in the ordinary course of *both* the debtor and the transferee" (emphasis added)).

Some courts have instead required the incurrence of the debt and the payment to be in the ordinary course of business *between* the debtor and the transferee. *See*, *e.g.*, *Fitzpatrick v. Cent. Commc'ns & Elecs., Inc. (In re Tenn. Valley Steel Corp.)*, 203 B.R. 949, 954 (Bankr. E.D. Tenn. 1996) (exception "requires proof that the debt and its payments are ordinary in relation to other business dealings between that creditor and that debtor"); *Brizendine v. Barrett Oil Distribs., Inc. (In re Brown Transp. Truckload, Inc.)*, 152 B.R. 690, 692 (Bankr. N.D. Ga. 1992) ("the better interpretation of the statute is that § 547(c)(2)(B) requires a transferee to show that the transfer was made in the ordinary course of business *between those two parties*"). Under this standard, any first-time transaction (like the one between C.W. Mining and SMC) would seem to be *per se* ineligible for the exception because there is no prior course of dealing to examine. *See In re Brown Transp. Truckload, Inc.*, 152 B.R. at 692 ("If there is no prior course of dealings between the parties, the transferee cannot satisfy this element.").

But we agree with the three circuits that have addressed the issue, who have held that a first-time transaction can qualify for the exception. *See Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys. Inc.)*, 482 F.3d 1118, 1125 (9th Cir. 2007) ("We agree that first-time transactions may satisfy the requirements of [the exception]."); *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003); *Gosch v. Burns (In re Finn)*, 909 F.2d

8

903, 908 (6th Cir. 1990) ("Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time."). After all, the statute refers to the "ordinary course of business or financial affairs *of* the debtor and the transferee," not *between* the debtor and the transferee. 11 U.S.C. § 547(c)(2) (emphasis added); *see Remes v. ASC Meat Imports, Ltd. (In re Morren Meat & Poultry Co.*), 92 B.R. 737, 740 (Bankr. W.D. Mich. 1988). Our interpretation also fits the purpose of the exception. As the Ninth Circuit wrote:

> With the "ordinary course of business" exception, Congress aimed not to protect well-established financial relations, but rather to "leave undisturbed *normal* financial relations, because [the exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."

*In re Ahaza Sys., Inc.*, 482 F.3d at 1125 (quoting *Union Bank*, 502 U.S. at 160). And we agree with the Seventh Circuit that "'the court can imagine little (short of the certain knowledge that its debt will not be paid) that would discourage a potential creditor from extending credit to a new customer in questionable financial circumstances more than the knowledge that it would not even be able to raise the ordinary course of business defense, if it is subsequently sued to recover an alleged preference.'" *Kleven*, 334 F.3d at 643 (quoting *Warsco v. Household Bank F.S.B.*, 272 B.R. 246, 252 (Bankr. N.D. Ind. 2002)).

One court has said that if § 547(c)(2)(A) can be satisfied by looking to the ordinary course of business of each party, then there is no need for the following subparagraph, § 547(c)(2)(B), which bases the exception on whether the transfer was "made according to ordinary business terms." *See In re Brown Transp. Truckload, Inc.*,

9

152 B.R. at 692 (requiring "the actions [to be] taken in the ordinary course of the parties' respective ordinary course of business, without showing the prior course of dealing between the parties, . . . would make [§547(c)(2)(B)] superfluous, since that subsection requires that the transfer also be made according to ordinary business terms").  But we have defined *ordinary business terms* to mean "those used in 'normal financing relations':  the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy."  *In re Meridith Hoffman Partners*, 12 F.3d at 1553.  This definition contemplates an examination of what is ordinary in the relevant industry, not what is ordinary in each party's respective practices.  *See Carrier Corp. v. Buckley (In re Globe Mfg. Corp.)*, 567 F.3d 1291, 1298 (11th Cir. 2009) (ordinary-business-terms alternative "require[s] proof that the payment is ordinary in relation to prevailing industry standards"); *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) ("'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage").  Under our interpretation of subparagraph C, there is no duplication in the statute.

Thus, as the Ninth Circuit said, "[A] first-time debt must be ordinary in relation to this debtor's and this creditor's past practices when dealing with other, similarly situated parties."  *In re Ahaza Sys., Inc.*, 482 F.3d at 1126.  (Of course, if the two parties have had an extended relationship, that could establish the ordinary course of business for each.  *See, e.g.*, *Riske v. C.T.S. Sys., Inc. (In re Keller Tool Corp.)*, 151 B.R. 912, 914 (Bankr. E.D. Miss. 1993); *In re Morren Meat & Poultry Co.*, 92 B.R. at 740.)

10

Still, there are real teeth in the ordinary-course requirement. With respect to incurrence of the debt, the requirement must be read in light of the "general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy." *Union Bank*, 502 U.S. at 160 (internal quotation marks omitted). It follows that "if a party has never engaged in similar transactions[,] . . . we consider more generally whether the debt is similar to what we would expect of similarly situated parties, *where the debtor is not sliding into bankruptcy*. . . . In [that] instance, the fact that a debt is the first of its kind for a party will be relevant but not dispositive." *In re Ahaza Sys., Inc.*, 482 F.3d at 1126 (emphasis added). When the new debt is very large and unprecedented, it may represent an expenditure (an incurrence of debt) that is being undertaken only because the debtor is sliding into bankruptcy. A failing business may engage in a desperate last-chance effort to try a risky scheme that just might work (and return the business to profitability) but that would not pose any risk to the business because it was clearly going to fail otherwise. There is a special incentive to invest in high-risk projects—even projects that would otherwise not make economic sense—because if the project succeeds, the company reaps the returns, but if the project fails, its creditors will bear the downside. *See* Barry E. Adler, *A Re-Examination of Near-Bankruptcy Investment Incentives*, 62 U. Chi. L. Rev. 575, 606 (Spring 1995) ("[T]he best justification for preference law is not that it deters collection from a static pool of assets, but that it deters an insolvent firm's investment in unduly

risky projects."); Robert K. Rasmussen, *The Ex Ante Effects of Bankruptcy Reform on Investment Incentives*, 72 Wash. U. L.Q. 1159, 1170–71 (Fall 1994).[4]

One case cited by the Trustee is instructive. In *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 520 (8th Cir. 2002), the debtor "organized Ponzi schemes to defraud investors, embezzled funds from his elderly clients' life savings to support his fraud, and then attempted to become solvent through check kiting and gambling." (footnotes omitted). The debt in question was incurred at Harrah's casino, where the debtor lost $48,400 gambling with chips obtained on credit. *See id.* at 521. The debt was paid out of the debtor's bank account within the 90-day preference period before his involuntary bankruptcy. *See id.* The Eighth Circuit determined that although the debt was incurred in "the ordinary course of the casino's financial affairs," it was not incurred in the ordinary course of the debtor's affairs. *Id.* at 527. That the debtor was not a professional gambler was probative although not dispositive. *See id.* "More important here is that [the debtor's] purpose for gambling, other than entertainment, was to cover huge losses arising from [his] fraud, embezzlement, and Ponzi schemes." *Id.* The court "decline[d] to hold that a desperate debtor's irresponsible accumulation of gambling

---

[4] We note, however, that in some instances a debt may be incurred in the ordinary course of business even though it was incurred only because the debtor was sliding into bankruptcy. For example, certain expenditures unique to struggling businesses—such as hiring a turnaround consultant, *see Ciesla v. Harney Mgmt. Partners (In re KLN Steel Prods. Co., LLC)*, 506 B.R. 461, 470–72 (Bankr. W.D. Tex 2014)—are likely to qualify for the exception. The concern is only with what might be termed "gambling" by a failing business.

debts in an ill-fated attempt to cover fraud and embezzlement losses qualifies as the ordinary course of his business or financial affairs." *Id.*

*Armstrong* is an extreme case. Its reasoning does not apply to the many ordinary-course business decisions that are in a sense gambles because no one can predict with certainty whether a change in practice will succeed. Courts should be deferential to a company's business decisions. But gambling need not be at a casino. And a debt incurred for an unduly risky project that can be justified only because the risk is borne solely by the company's creditors is not a debt incurred in the ordinary course of business.

As for the payment prong, courts commonly look to four factors to determine whether a payment was made in the ordinary course of business of the debtor and the transferee:

(1) length of time the parties were engaged in the type of dealing at issue;
(2) whether the amount or form of tender differed from past practices;
(3) whether the debtor or creditor engaged in any unusual collection or payment activities; and
(4) the circumstances under which the payment was made.

5 Collier on Bankruptcy, *supra* § 547.04[2][a][ii][B]; *see*, *e.g.*, *In re Ahaza Sys. Inc.*, 482 F.3d at 1129 (restating the fourth factor as "whether the creditor took advantage of the debtor's deteriorating financial condition" (internal quotation marks omitted)); *Brandt v. Repco Printers & Lithographers, Inc. (In re Healthco Int'l, Inc.)*, 132 F.3d 104, 109 (1st Cir. 1997) (court considers "the amount transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances

13

under which the transfer was effected"); *Jagow v. Grunwald (In re Allied Carriers' Exch., Inc.)*, 375 B.R. 610, 616 (B.A.P. 10th Cir. 2007); *Bohm v. Golden Knitting Mills, Inc. (In re Forman Enters. Inc.)*, 293 B.R. 848, 857 (Bankr. W.D. Pa. 2003) (courts "consider whether the transfer was ordinary as between the debtor and creditor," looking to "the time, the amount and the manner in which payment occurred").  For first-time transactions, however, "the court may refer solely to the written terms of the transaction to define the ordinary course of business between the parties."  5 Collier on Bankruptcy, *supra* § 547-04[2][9][ii][B].  Absent other peculiar circumstances, a payment made shortly before or at the due date will satisfy the statutory requirement.  *See id.*  ("The vast majority of ordinary course of business cases deal with payments that are made later than the express written terms require.").

We now examine how this law applies to the dealings between SMC and C.W. Mining.

### 1.    Was the Debt Incurred in the Ordinary Course of Business?

In June 2007, C.W. Mining agreed to purchase used electrical equipment for longwall mining and related services from SMC.  C.W. Mining and SMC had no prior relationship.  It is undisputed that the equipment and services under the contract were "within the normal scope of products and services" provided by SMC.  Aplt. App. at 168.  C.W. Mining thought that changing from a continuous-mining method to a longwall system would increase its mining capacity by a factor of four to five.  On July 9, SMC provided a quotation for the transaction that reflected the June agreement, and on

14

September 18, SMC issued an invoice for the majority of the parts and services in the amount of $805,539.75.

The Trustee contends that the $805,539.75 debt was not incurred in C.W. Mining's ordinary course of business. He asserts that "SMC provided no evidence of the ordinary course of business of [C.W. Mining] aside from noting that [it] mined coal and purchased equipment from SMC used to mine coal," Aplt. Br. at 15, and he contends that the bankruptcy court "should have required SMC to describe something of [C.W. Mining's] business history and current financial circumstances showing it was ordinary for [it] to incur large obligations for longwall equipment," *id.*

In our view, however, SMC satisfied its burden of producing evidence that the debt was incurred in the ordinary course of C.W. Mining's business. The purchase was an arm's length transaction, and the undisputed purpose of the purchase was to assist in mining operations. The Trustee's one-page argument on the point in response to SMC's motion for summary judgment argued only that C.W. Mining had been using the continuous-mining method until the purchase; C.W. Mining had been sued two years earlier by Aquila, Inc., by far the largest creditor in the bankruptcy; C.W. Mining had never done business with SMC before; and the equipment was used and needed to be refurbished, yet C.W. Mining had not done refurbishing before. The gist of the argument was simply that this was a first-time transaction. As we have already said, that is not enough. Although there is evidence that could support an assertion that C.W. Mining was

15

gambling with creditors' money,[5] the Trustee neither alerted the court to that evidence nor argued that such gambling was a possibility that SMC had the burden to disprove. The court was given no good reason to think that the debt was not incurred in the ordinary course of business. Absent exceptional circumstances not present here, we will not reverse on a ground inadequately presented to the trial court. *See Mitchell*, 218 F.3d at 1198–99.

### 2. Was the Payment to SMC Made in the Ordinary Course of Business?

The Trustee also contends that he may avoid the $200,000 payment to SMC under 11 U.S.C. § 547(c)(2)(A), which requires a payment to be "made in the ordinary course of business or financial affairs of the debtor and the transferee." On appeal we need examine only whether the payment was in the ordinary course of C.W. Mining's business because the Trustee does not contest that it was made in the ordinary course of SMC's business.

SMC sent C.W. Mining a quotation for the proposed purchase that set a total price of $1,064,036.06 and contained the following payment terms:

---

[5] The appellate appendix, and bankruptcy-court records that we can take judicial notice of, indicate that there is evidence (1) that C.W. Mining submitted an application to the Bureau of Land Management in 2000 stating that the mine was not amenable to longwall mining; (2) that when longwall mining was introduced by C.W. Mining, the coal quality did not meet contract specifications and the rate of production was much lower than for similar operations elsewhere; (3) that the operator that acquired rights to the mine in the bankruptcy proceedings reinstituted continuous mining; and (4) that removal of the longwall equipment (which was of doubtful value) was expensive.

16

- "Equipment shall be invoiced after completion of assembly and testing." Aplt. App. at 158.

- "The invoice . . . will be provided to the buyer on the date the initial factory testing is complete," and "shall be recognized by the buyer as the payment term inception date." *Id.*

- "*All invoices are net thirty (30) days from date of invoice*," with a "1-1/2% per month late charge [to] apply on all delinquent accounts." *Id.* (emphasis added).

The quotation further provided for the following "required" progress payments:

15% - Within 7 days of issuance of P.O. [purchase order]
25% - Upon issuance of submittals
25% - Upon release of manufacturing
25% - Upon completion of testing
10% - Upon completion of commissioning

*Id.*

On September 18, 2007, SMC issued an invoice to C.W. Mining for equipment

and services in the amount of $805,539.75. The invoice had three entries:

| | |
|---|---|
| 25% of total due upon issuance of submittals | $268,513.25 |
| 25% of total due upon release of manufacturing | $268,513.25 |
| 25% of total due upon completion of testing | $268,513.25 |

*Id.* at 165. The invoice labeled the payment terms as "SPECIAL," *id.*, but the bankruptcy

court determined that the designation reflected only that the customer "was to make

progress payments as it received invoices," *id.* at 287. On October 16, 2007, C.W.

Mining sent the challenged $200,000 to SMC by wire transfer to be applied to the

September 18 invoice.

The $200,000 payment was two days before the due date. It came from CW

Mining's own bank account. And there is no evidence of collection activity by SMC.

17

We affirm the bankruptcy court's ruling on summary judgment that the $200,000 payment was made in the ordinary course of C.W. Mining's business.

## II.    CONCLUSION

We AFFIRM the judgment of the bankruptcy court.