In re Nathaniel RICHARDSON and
Cleo Richardson, Debtors.

Nathaniel RICHARDSON and Cleo
Richardson, Plaintiffs,

v.

PHILADELPHIA HOUSING
AUTHORITY, Defendant.

Bankruptcy No. 88–11576F.
Adv. No. 88–0742F.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 21, 1988.

Michael Donahue, Community Legal Services, Philadelphia, Pa., for debtors/plaintiffs, Nathaniel Richardson and Cleo Richardson.

Susan F. May, Philadelphia, Pa., for defendant, Philadelphia Housing Authority.

Anthony R. Barone, Philadelphia, Pa., trustee.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

By this adversary proceeding the debtors, Nathaniel and Cleo Richardson, seek to recover from the defendant Philadelphia Housing Authority the sum of $685.00 as a voidable preference under § 547(b) of Title 11. Their right to bring this recovery action is premised on Bankruptcy Code §§ 522(h) and 547(b).[1] The defendant raises the affirmative defense that these funds should not be recovered pursuant to the exception set out at 11 U.S.C. § 547(c)(2). After trial, the parties submitted briefs on the issue of this statutory exception.[2]

This is a core proceeding. 28 U.S.C. § 157(b)(2)(F).

### I.

The debtors have been living at 911B Parish Place in Philadelphia since, approximately, 1983. Their lessor is the defendant Philadelphia Housing Authority (PHA). PHA commenced an eviction proceeding against the Richardsons prebankruptcy; a hearing was held in the Philadelphia Municipal Court on February 24, 1988. At that hearing the parties agreed to the entry of judgment in favor of PHA in the amount of $2,978.92, plus costs. In addition, PHA was given possession of the premises by

1. Section 522 provides in material part:
   (h) The debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—
   (1) such transfer is avoidable by the trustee under section ... 547 ...; and
   2) the trustee does not attempt to avoid such transfer.
   11 U.S.C. 522(h).

2. As the defendant only raised the section 547(c)(2) issue, that is the only issue I will consider. I do not pass upon whether the exception provided by § 547(c)(7) is relevant; this subsection states that a prepetition transfer may not be avoided if "... the aggregate value of all property that constitutes or is affected by such transfer is less than $600." *See generally, In re Vickery,* 63 B.R. 222 (Bankr.E.D.Tenn.1986). Nor do I pass upon whether the payment made was involuntary, pursuant to 11 U.S.C. § 522(g)(1). *See generally, In re Mason,* 69 B.R. 876, 881–82 (Bankr.E.D.Pa.1987).

judgment as of that date; however, the parties agreed that there would be no attempt to remove the Richardsons from the premises so long as they repaid the judgment according to a payment schedule set out in the agreement. That is, according to the terms of the agreement, PHA retained the right to have an alias writ of possession issue should the Richardsons fail to comply with the payment schedule. This, of course, would have resulted in the eviction of the Richardsons from their PHA apartment unit.

The payment schedule required that the debtors pay $650.00 on or before March 24, 1988. Thereafter, the Richardsons were to make all subsequent rental payments of $118.00 per month plus an additional $35.00 per month until the balance of the judgment, calculated at $2,328.92, was repaid.[3]

The Richardsons filed their chapter 7 bankruptcy petition on May 6, 1988. They listed a preference claim against PHA in the amount of $685.00 on their Schedule B-2 and asked that the claim be exempted, pursuant to 11 U.S.C. § 522(d)(5), on Schedule B-4 (Exhibit P-3).

The parties agree that the debtors did in fact make two payments to PHA within 90 days prior to the bankruptcy filing; the first payment was in the amount of $340.00, paid on or about March 23, 1988, followed by a $310.00 payment on or about April 6, 1988. There is a dispute over whether the debtors made a subsequent $35.00 payment before bankruptcy. The debtors testified that on April 28, 1988 two money orders, one for $118.00 (for the monthly rent) and one for $35.00 (toward the balance due under the judgment agree-

ment) were purchased, made payable to the Philadelphia Housing Authority, and delivered to the Authority.[4] (See Exhibit P-2). PHA testified that it received the $118.00 money order but never received the order for $35.00.[5]

Additional testimony was provided by the debtor-husband to the effect that the debtors had been delinquent previously on rental payments. They had been sued once before by PHA in an eviction proceeding, and had worked out some arrangement with PHA which avoided eviction. The terms of that arrangement were not offered in evidence.

PHA presented testimony from a project manager from the Richard Allen Homes, the housing project in which the debtors reside. She testified that the Richard Allen Homes project contains 1,100 apartment rental units; of these perhaps 20 are current in their rent; the remainder are delinquent. Approximately 336 tenants have what the manager termed "pre-court agreements" with the PHA designed to allow the tenants to catch up their delinquency, and approximately 761 court agreements (such as the one into which the debtors entered) exist with tenants for the same purpose.

## II.

The defendant concedes that the transfers were preferential within the meaning of section 547(b). However, it contends that the subject payments are immunized from application of § 547 by way of § 547(c)(2). Subsection (c)(2) provides:

---

3. The agreed-upon payment schedule does not incorporate the costs ($20.00) assessed against the Richardsons as part of the judgment.

4. Debtors do not contend that the normal rental payment on April 28, 1988, in the amount of $118.00, was preferential.

5. On the question of whether the $35.00 payment was made, I note that it is the plaintiffs' initial burden to produce evidence as to the fact of payment. The debtor-husband testified that he handed a money order in the amount of $35.00 to a PHA teller (a copy of a money order in this amount, dated April 28, 1988, was entered into evidence as part of Exhibit P-2). A

project manager testified on behalf of PHA that such a payment was not posted, and to her belief that all funds received are properly credited. (Another money order made out to PHA on behalf of the debtors was brought into evidence; dated April 28, 1988, an order for $118.00 (the monthly rent) is made part of Exhibit P-2.) Based upon the sworn testimony of the debtor that payment was made, coupled with the money order receipt made payable to PHA, I conclude, by a preponderance standard, that the payment was in fact made and that PHA's records contain an inadvertent omission.

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

■ PHA has the burden of proving the nonavoidability of a transfer under subsection (c)(2) of § 547. 11 U.S.C. § 547(g). This burden is met by proving each of the three elements of the defense by a preponderance of the evidence. *In re Seawinds Ltd.*, 91 B.R. 88 (N.D.Cal.1988); *In re Ullman*, 80 B.R. 101, 102 (Bankr.S.D.Ohio 1987); *In re Production Steel, Inc.*, 54 B.R. 417 (Bankr.M.D.Tenn.1985).

■ There appears to be no question but that the underlying debt—a rental arrearage—was incurred in the ordinary course of affairs, and that the challenged payments were made towards satisfying that debt. The restructuring of the payment terms does not alter the fact that the underlying debt was incurred under normal circumstances. *Matter of Red Way Cartage Co., Inc.*, 84 B.R. 459, 461 (Bankr.E.D. Mich.1988); *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okl. 1986). The first element of the section 547(c)(2) defense, therefore, has been satisfied.

The issue before me, then, is whether the PHA has met its burden of proving the elements of § 547(c)(2)(B) and (C). Regrettably, the phrases used therein ("ordinary course of business or financial affairs" and "according to ordinary terms") were not the subject of legislative debate, nor are they defined by the Code. The legislative history of subsection (c)(2) merely provides that "[t]he purpose of this exception is to leave undisturbed normal financing relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." For consumer bankruptcies, "the paragraph uses the phrase 'financial affairs' to include such nonbusiness activities as payment of monthly utility bills." H.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6329; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5874.

As the purpose of a preference action is to prevent a particular creditor from obtaining more favorable treatment than other creditors, that is, to insure equality of treatment, the purpose of the ordinary course of business and business terms exception is to ensure that normal transactions are not caught in the net of the trustee's avoidance powers. *In re Colonial Discount Corp.*, 807 F.2d 594, 600 (7th Cir.1986), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987); *Barash v. Public Finance Corp.*, 658 F.2d 504, 510 (7th Cir.1981). The obvious "extra-ordinary" transaction is the unusual one which results in the transferee obtaining an advantage in distribution over other bankruptcy creditors. It has been left to the courts to develop the test for "ordinariness" of the transfers under section 547(c)(2). *See 5 Collier on Bankruptcy* ¶ 547.10, 547–46 (15th ed.1988).

■ In the matter *sub judice*, I must examine the subject transfer from two perspectives. While subsections (B) and (C) test the transfer to determine whether, as a whole, it was made in the ordinary course of business or financial affairs, *In re Production Steel*, 54 B.R. at 423, the former subsection calls for a test pertaining to the "subjective" course of dealings between these particular parties, and the latter tests for the "objective" normative course of business of similarly-situated parties. *In re American Internat'l Airways, Inc.*, 83 B.R. 324 (Bankr.E.D.Pa.1988), *aff'd*, Order dated August 15, 1988 (E.D.Pa. VanArtsdalen, J.); *In re Steel Improv. Co.*, 79 B.R. 681 (Bankr.E.D.Mich.1987); *Matter of Van Huffel Tube Corp.*, 74 B.R. 579 (Bankr. N.D.Ohio 1987); *In re Magic Circle Energy*

*Corp.;* In re Production Steel, Inc.; *In re Economy Milling Co.,* 37 B.R. 914 (D.S.C. 1983).

■ To be "ordinary" as between the parties, under subsection (B), implies some consistency with other transactions between the same parties. A determination of what has been the ordinary course of conduct between the two parties will require that the court look at factors such as the length of time the parties have engaged in the type of dealing at issue, *In re Southern Industrial Banking Corp.,* 72 B.R. 512 (Bankr.E.D.Tenn.1987); whether the subject transfer was in an amount more than usually paid, *In re Vunovich,* 74 B.R. 629 (Bankr.D.Kan.1987); whether the payments were tendered in a manner different from previous payments, *In re Craig Oil Co.,* 785 F.2d 1563 (11th Cir. 1986); whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt, *In re Colonial Discount Corp.,* 807 F.2d 594, 600, *In re Daikin Miami Overseas, Inc.,* 65 B.R. 396 (S.D.Fla.1986); and whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition. *In re Production Steel; In re Magic Circle Energy Corp.*

Subsection (C) envisions that the transfer is ordinary in the context of the business or affairs in which the parties are engaged; it is an "industry-wide" test. Under this test courts will examine the same types of factors outlined above in the context of industry practices. Thus, in order to successfully defend against this avoidance action PHA must meet its burden as to both tests: ordinariness of the transfer with regard to these particular debtors, and the ordinariness of the transfer in the context of industry practice.

### III.

In showing that the subject transfers were made in the ordinary course of affairs between itself and the debtors, that is, consistent with other transactions between these parties, PHA argues that testimony elicited at trial from Mr. Richardson estab-lished that the debtors had previously entered into a rental repayment agreement similar to the one entered into on February 24, 1988. Indeed, Mr. Richardson did testify that he and his wife previously had been delinquent, to an unrevealed extent, on their rental payments. They apparently had been sued once before by PHA on an eviction proceeding; however, the debtor's testimony did not disclose what arrangement or agreement, if any, had been reached. It is not at all clear from the evidence whether the previous eviction proceeding resulted in a judicial agreement or in a "precourt agreement." The payment terms, if any, were not disclosed.

■ Prior decisions have held, and I agree, that payments made pursuant to a judgment or settlement agreement are not made in the ordinary course of business. *See In re Daikin Miami Overseas, Inc.* (District Court agreed with the bankruptcy judge's determination that payments made pursuant to a settlement agreement, which appeared to be the result of an antecedent debt, are simply not in ordinary course of business). *See also Matter of Red Way Cartage Co., Inc.,* 84 B.R. at 461 ("The fact that the parties negotiated an agreement for the payment of the antecedent debt and made payments pursuant to that agreement does not bring the payments within the 547(c)(2) exception."); *In re Holdway,* 83 B.R. 507 (Bankr.E.D.Tenn.1988) ("ordinariness" cannot exist where a creditor resorted to debt collection efforts through legal proceedings; defendant was not only required to file suit on his claim and obtain a judgment in an effort to collect his debt, he was also required to execute (by way of garnishment) on that judgment); *In re American Insulator Co.,* 60 B.R. 752, 756 (Bankr.E.D.Pa.1986) (payments held avoidable, where payments were made more than 16 months after debt was incurred and only after the creditor had obtained judgment on its claim prior to bankruptcy ("... Congress surely did not intend to define "ordinary business terms" in the preference provision as including the payments at issue in this case.")); *In re Brenton's Cove Dev. Co.,* 52 B.R. 287 (Bankr.D.

R.I.1985) (payment by debtor was not in ordinary course of business and thus preferential where payment not made until after creditor filed law suit and only after extensive negotiation and collection efforts were made some six months after debt was incurred). Payments pursuant to litigation agreements and judgments are a type of "unusual action" proscribed by Congress when it enacted § 547(b)(2)(B) and (C). PHA's actions, then, of suing these debtors in an eviction proceeding, and then collecting in connection with the parties' judicial settlement, falls into this category.

I recognize that where the manner and timing of the payments at issue were consistent with previous payments made by the debtor in the course of its dealings with the creditor, the ordinary course of business exception under subsection 547(c)(2)(B) is met. *See, e.g., In re Steel Improv. Co.; In re Southern Industrial Banking Corp.; In re Sunup/Sundown Inc.,* 66 B.R. 1021 (Bankr.S.D.Fla.1986). However, there was no evidence presented of similar previous payments in the instant case to evince their "ordinariness".

■ To the extent that PHA is arguing that the parties may adopt a payment practice at variance with their contract terms, which practice then becomes the ordinary course of business between them, I agree. The case of *In re Magic Circle Energy Corp.* is illustrative of this proposition. When the debtor corporation in that case began experiencing financial difficulties it entered into a workout with its creditors. As part of its workout with one particular creditor, the parties agreed to restructure the outstanding debt, and so the debtor executed a promissory note, payable in monthly installments over a seven year period. About 1½ years later the debtor filed for chapter 11 relief in bankruptcy. In the ninety days prior to filing the debtor made four installment payments. The court found consistency and an ordinary course

of conduct in the transactions where the payments had been occurring on a regular basis over a substantial period of time. *But compare, Matter of Xonics Imaging, Inc.,* 837 F.2d 763, 767 (7th Cir.1988) ("This case, however, is not one where the parties to a contract adopt an extra-contractual practice that becomes the ordinary course of business between them.... Obviously a single, *timely* payment could not establish a pattern, history or course of dealings in which *late* payment was consistent with the parties' practice though contrary to their contract.") (emphasis in original).

This also is not a dispute where the ordinary course of business has been modified by a new business practice. There is no lengthy or established course of conduct between these parties that would render the contested payments "ordinary." [6]

Another indication that a transaction was made out of the ordinary course of affairs is that the transaction resulted in additional security and safety for the creditor. *In re Production Steel, Inc.; In re Magic Circle Energy Corp. See also In re Bob Grissett Golf Shoppes, Inc.,* 78 B.R. 787 (Bankr.E.D.Va.1987) (payments by chapter 7 debtor to his creditor were not within the ordinary course of business where payments were made in an effort to cure a large arrearage and upon the creditor's assertion that, if arrearages were not cured, it would discontinue shipments). It safely may be said that here PHA did obtain further security and safety; under the judicial agreement, its ability to seek the issuance of a writ for possession was to continue for five years. This is an effective exercise of leverage over the debtors to obtain payments on the debt. On this point, PHA's reliance on *In re Magic Circle Energy Corp.* is misplaced: the court there found that the debt workout was *quid pro quo* between two commercial entities, neither of which gained advantage in the transactions.[7]

---

**6.** I appreciate the fact that the transaction need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally. *In re Economy Milling Co., Inc.,* 37 B.R. 914 (D.S.C.1983); *In re Magic Circle Energy Corp.,* 64 B.R. at 274–275. Clearly,

the question is whether there was an "unusual action" (*see* H.Rep. No. 95–595) that deviates from normal business practices between the parties.

**7.** As stated above, *In re Magic Circle* is further differentiated by the fact that payments on that long-term restructuring agreement continued

The totality of the circumstances reveals that the questioned payments were not made in the ordinary course of conduct between these apartment renters and their lessor. The payments were made under the threat of losing their occupancy, pursuant to a judicial settlement; the amounts were of an amount and were paid in a time different from that called for by the lease agreement; nor am I presented with evidence that this course of conduct is established as ordinary between the parties by a previous rental repayment agreement. In short, I find that the defendant has failed to meet its burden of proving that § 547(c)(2)(B) is applicable.

IV.

■ PHA has failed to establish that the transfers here were made in the ordinary course of dealings with these particular debtors, and this alone is fatal to their defense. However, I note that it is also evident that PHA failed to produce some evidence as to whether the subject transfer was made according to "common industry practice." At trial, evidence was presented to the effect that nearly all of the tenants at this housing project enter or have entered into similar rental repayment agreements. The defendant argues that it is the normal business practice of PHA to enter into such agreements with their rental arrearages in some fashion.

The defendant failed, however, to produce evidence of this practice. There was no standardized form presented, nor, more significantly, was evidence produced of the terms of other agreements. Even if I were to accept arguendo PHA's assertion to look only to its business practice as setting the norm for its "industry," I cannot say that it has demonstrated that it has a customary business practice of entering into terms such as the ones in the instant proceeding.

No defense having been proven by the defendant, and the plaintiffs having proven the applicability of section 547(b), judgment will enter against PHA in the amount sought by the plaintiffs.

for a year or more before the bankruptcy filing. Accordingly, there was a long course of conduct that could be reviewed between the parties, unlike the instant proceeding.