**In re Shvilla Bryan GAINES, Debtor.**

**Adam M. Goodman, Chapter 13 Trustee, Plaintiff,**

**v.**

**Credit Union of Georgia, Defendant.**

**Bankruptcy No. 12–63357–JRS.**
**Adversary No. 12–05627–JRS.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Nov. 21, 2013.

634

Adam M. Goodman, Atlanta, GA, pro se.

Craig B. Lefkoff, Lefkoff, Rubin & Gleason PC, Atlanta, GA, for Defendant.

### ORDER

JAMES R. SACCA, Bankruptcy Judge.

This adversary proceeding requires the Court to separate the ordinary from the extraordinary. The Chapter 13 Trustee has commenced this adversary proceeding and moved for summary judgment, arguing that certain payments the Debtor made to the Defendant Credit Union of Georgia within 90 days of filing her bankruptcy petition constituted recoverable preferential transfers within the meaning of 11 U.S.C. § 547(b). The Defendant has responded with its own motion for summary judgment, arguing that these payments—which were made pursuant to a forbearance agreement the Debtor entered into following a nondischargeability judgment in a prior bankruptcy case—are not recoverable because they were made in the ordinary course of the Debtor's financial affairs within the meaning of § 547(c)(2). The Court now considers whether these transfers were in fact ordinary while ruling on these cross-motions for summary judgment.

### *Summary Judgment Standard*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.* The Court "should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 919 (11th Cir.1993), *reh'g denied*, 16 F.3d 1233 (11th Cir.1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, he must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of his claim on that legal issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). He must support his motion with credible evidence that would entitle him to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, he is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of material fact. *Id.*

For issues upon which the non-moving party bears the burden of proof at trial, he "must make a showing sufficient to establish the existence of [each] element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Failure to make such a showing on any essential element "renders all other facts immaterial" and precludes a finding that a genuine issue of material fact exists. *Id.* at 323, 106 S.Ct. 2548. Accordingly, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment in favor of the moving party is appropriate. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotes omitted).

### *Factual Background*

Keeping the above standard in mind, the Court lays out the following facts based on

the parties' submissions and all other matters of record. Defendant Credit Union of Georgia (the "Credit Union") is a member-owned financial institution. (Def.'s Statement of Material Facts ("SMF") [Doc. 26] ¶ 1). Shvilla Bryan Gaines, the Debtor in the underlying bankruptcy case, became a member of the Credit Union in 2001. (Def.'s SMF [Doc. 26] ¶¶ 2, 5). The Debtor had several savings accounts, a checking account, and a Visa credit card with the Credit Union. (Def.'s SMF [Doc. 26] ¶ 6). The Debtor made charges and regular payments on the Visa credit card account and was in good standing with the Credit Union up until May 2008. (Def.'s SMF [Doc. 26] ¶ 7).

On May 19, 2008, the Debtor filed for protection under Chapter 7 of the Bankruptcy Code (Case No. 08–69396–MGD) (the "Prior Case"). In the Prior Case, the Debtor identified the Credit Union as the holder of a claim in the amount of $17,500 on her Schedule F, which lists her creditors holding unsecured claims. A few months after the Debtor filed her petition in the Prior Case, the Credit Union filed a motion seeking court authorization to conduct an examination of the Debtor pursuant to Bankruptcy Rule 2004. (Case No. 08–69396–MGD, Doc. 15). Shortly thereafter, the Credit Union filed a motion to extend the time to file a complaint to determine the dischargeability of its claim pursuant to 11 U.S.C. § 523 and/or file a complaint objecting to Debtor's discharge pursuant to 11 U.S.C. § 727. (Case No. 08–69396–MGD, Doc. 18). The court in the Prior Case entered a consent order granting this motion a few days later. (Case No. 08–69396–MGD, Doc. 19).

On September 11, 2008, the Credit Union filed a complaint in the Prior Case commencing an adversary proceeding against the Debtor. (Case No. 08–06510–MGD). In its complaint, the Credit Union alleged that it had a claim based on Debtor's Visa account, and it sought to recover $10,000 plus interest, costs, and fees. (Case No. 08–06510–MGD, Doc. 1). The Credit Union further alleged that the Debtor incurred charges on her Visa card and "knew that she did not have the ability to repay the indebtedness" and that she "obtained money or credit through her Visa … by false pretenses, false representations or actual fraud." *Id.* Accordingly, the Credit Union alleged that its claim was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). *Id.* A few days after the Credit Union filed its complaint, the court in the Prior Case entered a succinct consent judgment (the "Consent Judgment"), which simply stated that the Debtor's debt to the Credit Union was excepted from discharge and that judgment was rendered in the Credit Union's favor for $10,000 plus $250 in costs, with 12% interest to accrue. (Case No. 08–06510–MGD, Doc. 4).

A few days before the Consent Judgment was entered, the Debtor and the Credit Union entered into a forbearance agreement (the "Forbearance Agreement"). (Leaphart Aff. [Doc. 28] Ex. A). The Forbearance Agreement indicates that the Debtor wanted the Credit Union "to forbear from exercising its rights to enforce and collect on" the debt that the Consent Judgment rendered nondischargeable. *Id.* To prevent such collection action, the Debtor agreed to make monthly payments of $150.00 per month for 48 months, followed by a final balloon payment of $2,800.00, which would be due on October 1, 2012. *Id.* Not surprisingly, the Forbearance Agreement did not permit the Debtor to continue to use her Visa credit card at all, let alone on the same terms and conditions that were applicable prior to the filing of the Prior Case.

The Debtor repaid her debt to the Credit Union under the Consent Judgment substantially according to the terms of the Forbearance Agreement and never defaulted on it. (Def.'s SMF [Doc. 26] ¶ 12). In fact, the Debtor made several early payments and completed her payment plan ahead of schedule, making her final balloon payment on May 19, 2012—about four and a half months before it was due. (Def.'s SMF [Doc. 26] ¶ 14; Pl.'s SMF [Doc. 17] ¶ 7). But despite repaying the Credit Union early, the Debtor again found herself unable to repay other creditors. On May 30, 2012, the Debtor filed for protection under Chapter 13 of the Bankruptcy Code, thus commencing the current underlying bankruptcy case less than two weeks after making the final balloon payment to the Credit Union.

A few months after the Debtor filed the underlying case, the Chapter 13 Trustee (the "Trustee") filed a complaint commencing this adversary proceeding against the Credit Union. [Doc. 1]. The Trustee later amended this complaint (the "Amended Complaint"). [Doc. 34]. In the Amended Complaint, the Trustee seeks to avoid and recover the last few payments made to the Credit Union totaling $3,400.00 (the "Transfers") as preferential transfers pursuant to 11 U.S.C. §§ 547 and 550.

The parties do not dispute that the Debtor made certain transfers to the Credit Union within 90 days before filing for bankruptcy. The Debtor made payments of $150.00 to the Credit Union on March 2, March 30, and May 1, 2012. (Pl.'s SMF [Doc. 17] ¶¶ 4–6). Then on May 19, 2012, the Debtor paid the Credit Union $2,950.00, which constituted the Debtor's final monthly payment plus the balloon payment. (Pl.'s SMF [Doc. 17] ¶ 7).

One June 14, 2013, the Trustee filed a Motion for Summary Judgment (the

"Plaintiff's Motion"), arguing that he is entitled to recover these payments as preferential transfers. [Doc. 16]. On July 15, 2013, the Credit Union filed a response to the Plaintiff's Motion, as well as its own Motion for Summary Judgment (the "Defendant's Motion"), arguing that the Transfers are not recoverable because the Debtor made them in the ordinary course of her financial affairs. [Doc. 24]. The Trustee responded to that cross-motion [Doc. 36], and the Credit Union replied [Doc. 37]. The parties' cross-motions for summary judgment are ripe for adjudication.

### Timeliness of Defendant's Motion

As a threshold matter, the Court must decide whether the Defendant's Motion was timely. The Trustee argues in his response that the Defendant's Motion was overdue by a month, pointing out that the Court set a deadline of June 15, 2013 for dispositive motions. *See* Order dated April 1, 2013. [Doc. 13]. The Court also entered a Consent Order extending the time for the Credit Union to file a response through July 15, 2013. [Doc. 20]. "Defendant's filing of a cross-motion for summary judgment is an appropriate response to Plaintiff's motion." *Ellenberg v. Tulip Production Polymerics, Inc. (In re T.B. Home Sewing Enterprises, Inc.)*, 173 B.R. 782, 785 (Bankr.N.D.Ga.1993). The Defendant's Motion was filed by July 15, 2013, before the extended deadline to respond expired. Accordingly, Defendant's Motion was timely.

### Preferential Transfer Basics

■ Section 547(b) of the Bankruptcy Code authorizes the Trustee to "avoid any transfer of an interest of the debtor in property" as a preferential transfer under certain conditions. 11 U.S.C. § 547(b). A preferential transfer is one "that enables a creditor to receive payment of a greater percentage of his claim against the debtor

than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate." *Union Bank v. Wolas,* 502 U.S. 151, 160–61, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). The purpose of the Bankruptcy Code's preferential transfer provisions is twofold: Primarily, the goal is to "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor," and a secondary aim is to discourage creditors from "racing to the courthouse to dismember the debtor during his slide into bankruptcy." [1] *Id.* at 161, 112 S.Ct. 527.

To successfully avoid a transfer as preferential under 547(b), the Trustee must prove five elements: he must prove that the transfer was (1) "to or for the benefit of a creditor," (2) "for or on account of an antecedent debt owed by the debtor before such transfer was made," (3) "made while the debtor was insolvent," (4) "made on or within 90 days before the date of the filing of the petition," [2] and that it (5) enabled the defendant to receive more than it would have received in a hypothetical Chapter 7 liquidation if the transfer had not been made. 11 U.S.C. § 547(b). Here, the Trustee has made a showing sufficient for the Court to conclude that all

of these elements have been met, which the Credit Union does not dispute. Instead, the Credit Union argues that the Transfers are not avoidable because they were payments made in the ordinary course of the Debtor's financial affairs.

### Ordinary Course of Business or Financial Affairs

Section 547(c) of the Bankruptcy Code provides several exceptions to the Trustee's authority to avoid transfers as preferential. Among these exceptions is the one contained in 547(c)(2), which is commonly known as the "ordinary course of business" exception. The goal of this exception is to "leave undisturbed normal financial relations." H.R.Rep. No. 95–595, at 373, U.S.Code Cong. & Admin.News 1978, p. 6329.

■ The ordinary course of business exception applies to any transfer that "was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee" if the transfer was either "made in the ordinary course of business or financial affairs of the debtor and the transferee" or "made according to ordinary business terms." [3] 11 U.S.C. § 547(c)(2). In other

---

1. *See also Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw (In re Issac Leaseco, Inc.),* 389 F.3d 1205, 1211 (11th Cir.2004) ("Ensuring equal distribution among creditors is the 'more important' purpose of the preference statute.") (*citing Union Bank,* 502 U.S. at 161, 112 S.Ct. 527).

2. Section 547(b)(4)(B) of the Bankruptcy Code expands this look-back period to one year if the transferee-defendant was an "insider." Here, the Trustee has not alleged that the Credit Union was an insider of the Debtor.

3. The inclusion of the term "financial affairs" indicates that Congress intended this exception to apply to consumer debtors as well as business debtors. *See* 797 H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 373 (1977); S.Rep.

No. 95–989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874, 6329. (explaining that the ordinary course of business exception "protects ordinary course of business (or of financial affairs, where a business is not involved) transfers" and that "[f]or the case of a consumer, the paragraph uses the phrase 'financial affairs' to include such nonbusiness activities as payment of monthly utility bills"). In his briefs, the Trustee seems to focus on the Debtor's occupation and what debts she would have incurred and repaid in a business capacity. But this focus is misplaced because the Debtor is an individual, not a business. Thus the proper focus is on her personal financial affairs.

words, the debt must have been incurred in the ordinary course, but the repayment may have been made either in the ordinary course or according to ordinary business terms for this exception to apply. This exception is in the nature of an affirmative defense, so the Defendant has the burden of proving its elements. 11 U.S.C. § 547(g).

### Nature of the Debt

■ The first question here is whether the Transfers were in repayment of a debt that the Debtor incurred in the ordinary course of her financial affairs within the meaning of § 547(c)(2). In order to answer that question, the source and nature of the debt at issue must be determined. Although the Credit Union focuses only on the terms of the Forbearance Agreement, "both the pre-Agreement arrangement between [the debtor] and [the creditor] and the Agreement itself are relevant to" determining whether the debt was incurred in the ordinary course. *Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1127 (9th Cir.2007). Therefore, the Court must also consider the transactions between the Debtor and the Credit Union that preceded the Forbearance Agreement.

■ The seeds of the debt were planted when the Debtor made charges on her Visa credit card years ago, before her prior bankruptcy case. Arguably, the restructuring of the payment terms following the Consent Judgment and the Forbearance Agreement did not change the source and the nature of the underlying debt. *See Richardson v. Philadelphia Housing Authority (In re Richardson)*, 94 B.R. 56, 59 (Bankr.E.D.Pa.1988) ("The restructuring of the payment terms does not alter the fact that the underlying debt was incurred under normal circumstances.") (citations omitted); *Gold v. Kubicki (Matter of Red Way Cartage Co., Inc.)*, 84 B.R. 459, 461 (Bankr.E.D.Mich.1988) (debt was incurred prior to—not at time of—restructuring and promissory note); *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986) (refusing to accept the proposition that the consolidation of debt into a long-term promissory note "wrought a metamorphosis wherein the nature of the debt was altered"). Thus, the Court will consider the Debtor's charges on her Visa card when determining whether this debt was incurred in the ordinary course of her financial affairs.

Ordinarily, the incurring of long-term consumer debt is consistent with "normal financial relations" if not incurred unusually during a slide into bankruptcy, and it will typically satisfy § 547(c)(2)'s requirement that it be incurred in the ordinary course of the debtor's financial affairs. *Gosch v. Burns (In re Finn)*, 909 F.2d 903, 907 (6th Cir.1990). So on first glance, it would appear that the Debtor's charges on her Visa card would have been in the ordinary course of her financial affairs, since consumers commonly use credit cards to incur routine expenses in our modern economy.

■ But what makes the way the Debtor incurred these charges extraordinary is that—according to the Consent Judgment—she evidently incurred them fraudulently. "A debt cannot be incurred in the ordinary course of business where the debtor engaged in fraudulent conduct." *Computer World Solution, Inc. v. Apple Fund, L.P. (In re Computer World Solution, Inc.)*, 427 B.R. 680, 690 (Bankr. N.D.Ill.2010); *see also Rushton v. SMC Elec. Prods. Inc. (In re C.W. Min. Co.)*, 500 B.R. 635 (10th Cir. BAP 2013) (noting that a "debt will not be considered incurred in the ordinary course of business if creation of the debt is ... fraudulent") (*quoting* 5 COLLIER ON BANKRUPTCY

¶ 547.04[2][a][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013)). If the Debtor's charges on her Visa card had been ordinary run-of-the-mill credit card charges, the Credit Union never would have had a claim for nondischargeability under § 523(a)(2)(A). The fact that the Credit Union obtained a judgment on just such a claim leads inescapably to the conclusion that the Debtor did not incur this debt in the ordinary course of her financial affairs. The circumstances surrounding how this debt was incurred simply do not invoke the vision of normal financial relations that motivated Congress to enact the ordinary course of business exception.

Even if the Debtor had incurred this debt in the ordinary course of her financial affairs, the ordinary course of business exception still does not apply because the Transfers were not made in the ordinary course between the parties or according to ordinary business terms, as explained below.

### Ordinary Payments: Two Tests—Subjective and Objective

The next step in the analysis under § 547(c)(2) is to determine whether the Transfers were either (1) "made in the ordinary course of business or financial affairs of the debtor and the transferee," or (2) "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(A) & (B). The first of these tests is commonly known as the subjective test—focusing on what happened between the relevant debtor and creditor—and the second is known as the objective test—focusing on what typically happens with most debtors and creditors in the relevant industry. As originally enacted, this Bankruptcy Code subsection was written in the conjunctive and required the defendant to prove that the debt was repaid both in the ordinary course of affairs between the debtor and creditor *and* according to ordinary business terms. When Congress amended the Bankruptcy Code in 2005, it eased the burden on defendants by now requiring them to only satisfy one of these two elements. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, Title IV, § 409, 119 Stat 23 (April 20, 2005).

### The Subjective Test

■ In order to satisfy the first test under Section 547(c)(2)—and prove that the Transfers were made in the ordinary course of the financial affairs of the debtor and the transferee—the Credit Union must demonstrate that they had "some consistency with other business transactions between the debtor and the creditor." *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986). In making this determination, courts have considered various factors, including: (1) the length of time the parties have had a business relationship; (2) whether the subject transfer was higher than the amount usually paid; (3) the timing and method of payments; (4) any unusual collection activity by the creditor; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating finances. *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563 (11th Cir.1986); *Richardson v. Philadelphia Housing Authority (In re Richardson)*, 94 B.R. 56, 60 (Bankr. E.D.Pa.1988) (citations omitted). These factors all have some relevance here.

■ The Debtor and the Credit Union have had a business relationship for years, going back to at least 2008. The record does not reveal exactly when the Debtor opened her Visa account or when she began making payments on that account. At a minimum though, the Debtor did make regular payments of $150.00 per month pursuant to the Forbearance Agreement from September 2008 through May 2012.

This consistency indicates that a payment of $150.00 in any given month could be considered ordinary, all else being equal.

But the final payment on May 19, 2012 for $2,950.00 was substantially more than the Debtor had historically paid to the Credit Union. This amount was unusually large, considering the amount of the previous payments. The Credit Union points out that the Debtor was simply making the balloon payment that the Forbearance Agreement provided for, but the fact that the parties contracted for an unusually large payment does not make it any less unusual.

Also, the timing of the Transfers was unusual. The record reveals that the Debtor actually made several of her payments early and satisfied her debt to the Credit Union well before the Forbearance Agreement required her to do so. In fact, she apparently made several early payments in 2010 and made her final balloon payment nearly six months before it was due. Thus the Transfers were payments made before they were actually due, which would have been after the Debtor filed her bankruptcy petition. Presumably, the Debtor hurriedly made these payments on this nondischargeable debt just in time to pay the Credit Union in full before filing for bankruptcy again, to the detriment of her other creditors.

▉ Further, the Credit Union argues—and its representative attests—that it engaged in no coercion or unusual collection activity, and that the Debtor made the Transfers voluntarily. But to accept this proposition, the Court must ignore everything that transpired before commencement of payments under the Forbearance Agreement. In fact, the Credit Union *did* engage in coercion and unusual collection activity: it sought to examine the Debtor and filed an adversary proceeding in the Prior Case asserting that a portion of the debt was incurred fraudulently, and then it obtained the Consent Judgment, which rendered a portion of its previously dischargeable debt nondischargeable. Certainly, filing a lawsuit against someone and obtaining a judgment amounts to unusual collection activity—in fact, it is perhaps the most unusual collection activity of all. And the Debtor's payments under the Forbearance Agreement—including the Transfers—were directly in response to those unusual collection actions. The 11th Circuit has explained that the ordinary course of business exception protects only "those payments which do not result from 'unusual' debt collection or payment practices," and even seemingly "normal" payments are not covered by the exception when made in response to such practices. *Craig Oil Co.*, 785 F.2d at 1566.

Finally, the Credit Union has gained an advantage over other creditors. By obtaining the Consent Judgment, the Credit Union managed to transform its previously dischargeable debt into one that had become nondischargeable. By doing so, the Credit Union has obtained additional safety and security, knowing that it must be paid in full. And when the Debtor made the Transfers before they were due and just before filing bankruptcy, the Credit Union gained an advantage over other creditors—receiving payment in full upfront—while the rest of the creditors will have their payments stretched out over the course of the Debtor's Chapter 13 plan, if they receive anything at all.

In sum, analysis of the relevant factors compels the conclusion that the Transfers were not made in the ordinary course of the financial affairs of the Debtor and the Credit Union. Thus the Credit Union has failed to demonstrate that the Transfers qualify for the ordinary course of business exception under the subjective test.

## The Objective Test

■ Despite failing the subjective test, the Credit Union still could prevail—if the debt had been incurred in the ordinary course—by showing the ability to pass the objective test, namely that the Transfers were made according to "ordinary business terms." When considering this question, the Court must examine the ordinary standards in the creditor's industry. *Miller v. Florida Mining and Materials (In re A.W. & Associates, Inc.)*, 136 F.3d 1439, 1442 (11th Cir.1998). Thus ordinary business terms "refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage." *Id.* at 1443 (*quoting In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993)). And "only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of" the objective test. *Id.*

Courts are divided over whether the terms must be ordinary for a normal customer or one who is under financial distress. The Second Circuit takes the position that the terms are ordinary if they are ordinary for customers under financial distress. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 42 (2d Cir.1996). Similarly, the Eight Circuit holds that the proper comparison is to "a prevailing practice among similarly situated members of the industry facing the same or similar problems." *Jones v. United Savings and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.)*, 9 F.3d 680, 685 (8th Cir.1993). On the other hand, the Tenth Circuit has concluded that ordinary business terms "are those used in 'normal financing relations': the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy." *Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir.1993).

The Court need not resolve this split of authority because under either standard, nothing is ordinary about accusing a debtor of fraud and obtaining a nondischargeability judgment. The Credit Union contends that the Debtor simply agreed to remain personally liable on her debt to the Credit Union by consenting to its nondischargeability. If the Debtor felt it was in her best interests to remain personally liable on the debt, she could have done so by signing a reaffirmation agreement. Instead, what happened here is that the Credit Union sought to examine the Debtor in the Prior Case, threatening to press for not only the nondischargeability of its claim, but also possibly the denial of the Debtor's discharge altogether. Then it did in fact file a complaint accusing the Debtor of fraud; and she agreed to the Consent Judgment, entered into the Forbearance Agreement, and began making payments shortly thereafter—all in direct response to that litigation.

The Credit Union further contends that it is common practice in the credit union industry to work out repayment arrangements including monthly installments and balloon payments, and it has submitted several affidavits to support this contention. If this situation involved ordinary debt restructuring, the Credit Union may have a viable argument. Most circuit courts to consider the issue have concluded that payments made pursuant to a debt restructuring agreement may still be made according to ordinary business terms. *See, e.g., Arrow Electronics, Inc. v. Justus (In re Kaypro)*, 218 F.3d 1070 (9th Cir. 2000); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30 (2d Cir. 1996). This standard allows creditors some flexibility to work with debtors and keep supplying them with goods, services,

or crucial cash flow in order to help them stave off bankruptcy. *See Roblin Indus., Inc.,* 78 F.3d at 41 ("The exception benefits all creditors by protecting payments received by those creditors who remain committed to a debtor during times of financial distress . . . ."). Allowing this sort of flexibility encourages creditors to work with debtors and keep them out of bankruptcy court, which is a laudable goal.

Although payments pursuant to a debt restructuring agreement may be ordinary, payments made in response to a creditor bringing court action are extraordinary. *E.g., Hickey v. Nightingale Roofing, Inc.,* 83 B.R. 180 (D.Mass.1988); *Maloney–Crawford, Inc. v. Huntco Steel, Inc. (In re Maloney–Crawford, Inc.),* 144 B.R. 531 (Bankr.N.D.Okla.1992); *Barber v. Lebo (In re Indus. & Mun. Eng'g, Inc.),* 127 B.R. 848 (Bankr.C.D.Ill.1990); *Richardson v. Philadelphia Housing Authority (In re Richardson),* 94 B.R. 56 (Bankr. E.D.Pa.1988); *Holdway v. Duvoisin (In re Holdway),* 83 B.R. 507 (Bankr.E.D.Tenn. 1988); *Am. Insulator Co. v. Marsh Plastics, Inc. (In re Am. Insulator Co.),* 60 B.R. 752 (Bankr.E.D.Pa.1986); *In re Brenton's Cove Dev. Co.,* 52 B.R. 287 (Bankr. D.R.I.1985). "Payments pursuant to litigation agreements and judgments are a type of 'unusual action' proscribed by Congress when it enacted" the preference provisions of the Bankruptcy Code and the ordinary course of business exception. *In re Richardson,* 94 B.R. at 61.

As explained above, the entire history of how a debt was incurred must be considered, and simply restructuring a debt and receiving regular payments does not transform an extraordinary judgment following litigation into a series of ordinary payments within the meaning of § 547(c)(2). *In re Indus. & Mun. Eng'g, Inc.,* 127 B.R. at 850 ("[T]he payment was made at regular intervals. But that fact alone does not qualify the payment for the exception. The judgment was not incurred in the ordinary course of the Debtor's business. It was incurred to settle a lawsuit."). If creditors could come within the meaning of the exception simply by entering into a restructuring agreement, we would likely see every defendant attempt to assert the ordinary course of business defense by arguing that a payment or payments made to it were pursuant to an agreement entered into and completed on the eve of bankruptcy. This Court does not believe Congress could have intended such a result.

In sum, the Transfers—which the Debtor made pursuant to a forbearance agreement after the Credit Union filed a complaint accusing the Debtor of fraud and after it obtained a nondischargeability judgment—do not come within the ordinary course of business exception contained in § 547(c)(2). The Trustee has shown that the elements of an avoidable preference under § 547 have been met, and the Credit Union has failed to meet its burden of showing that the ordinary course of business exception applies here.

### Conclusion

For the reasons stated above, it is hereby

ORDERED that the Plaintiff's Motion is GRANTED. The Plaintiff is entitled to avoid the transfer of $3,400.00 from the Debtor to the Defendant pursuant to 11 U.S.C. § 547 and is authorized to recover that amount from the Defendant pursuant to 11 U.S.C. § 550. It is further

ORDERED that the Defendant's Motion is DENIED.

**IT IS ORDERED.**